THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| VITO GALLICCHIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:24-cv-08135 (PMH) |
| | ) | |
| J. JAMISON, J. KNIBB, A. LINLEY, | ) | |
| J. VANDERHEY-WRIGHT, and B. WALLS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR COMPENSATORY DAMAGES

Plaintiff, Vito Gallicchio ("Gallicchio"), for his First Amended Complaint against Defendant United States of America ("United States" or "Defendant"), alleges as follows:

I.    PARTIES

1.    Gallicchio is an individual who was previously incarcerated at FCI Otisville. He

is a resident of the State of New York.

2.    Defendant United States maintains a service address of: (a) United States Attorney for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, New York 10007; and (b) Attorney General of the United States, 950 Pennsylvania Ave. NW, Washington D.C. 20530.

## II.   JURISDICTION AND VENUE

3.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1346(b).

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1402.

## III.   FACTUAL HISTORY

5.    On October 3, 2023, Gallicchio placed a signed copy of a Federal Tort Claims Act Administrative Claim Form 95 ("Form 95") in the prison mailbox at FCI Allenwood. The Form 95 was addressed to the Federal Bureau of Prisons ("BOP") Northeast Regional Office, and included a description of loss, date of loss, and a sum-certain demand. On October 31, 2023, Gallicchio mailed a letter to the BOP Northeast Regional Office with a copy of his Form 95. In that letter, he requested a status update because he had not received any acknowledgement from the BOP of his administrative claim. In May 2024, Gallicchio mailed a second letter to the BOP Northeast Regional Office, again requesting the status of his administrative claim. None of his requests were responded to. It has been over six months since the presentation of his administrative claim, yet the BOP has not denied his claim. Accordingly, the claim is deemed denied.

6.  Upon admission into the BOP, Gallicchio advised agents of Defendant United States that he previously had medical issues with his heart.

7.  Starting in November 2022, while at FCI Otisville, Gallicchio began to show symptoms of a serious medical condition. He told the unit officer that he felt terrible, had chills, loss of appetite, and fatigue. The unit officer called the Health Services Unit ("HSU") and informed the prison medical staff that Gallicchio was really pale and advised them of his reported symptoms. The unit officer told the HSU staff member that Gallicchio "really looked bad."

8.  Gallicchio reported to HSU and was seen by P.A. Jayne VanderHey-Wright, who took his vitals and then dismissed him back to his housing unit, stating that he "looked fine."

9.  Between December 2022 and early January 2023, Gallicchio repeatedly complained to the unit officer about his symptoms, which had worsened. He reported to HSU and advised the medical staff of the same, and then was returned to his unit without any additional medical treatment. P.A. VanderHey-Wright maintained the position that Gallicchio was in "good health."

10.  By the end of January 2023, Gallicchio's weight loss had accelerated; he was constantly short of breath and exhausted. He submitted multiple complaints of his symptoms to HSU, but his complaints were ignored.

11.  In February 2023, Gallicchio was so ill that the unit officer ordered two other

inmates to help him walk to HSU. Gallicchio was seen by EMT Jake Knibbs. For the prior week, Gallicchio had been slurring his words and was generally incoherent. Knibbs immediately assumed Gallicchio was intoxicated and administered two separate sobriety tests. Both tests were negative for alcohol consumption. Due to Gallicchio's slurred speech and incoherent state, Knibbs assumed Gallicchio had ingested some form of illicit substance and had him placed in punitive solitary confinement in the Segregated Housing Unit ("SHU"). Knibbs charged Gallicchio with ingesting an illicit substance. The only documented treatment provided by Knibbs was "counseling" on "hand and respiratory hygiene."

12.    While in the SHU for almost two months, Gallicchio's health worsened. He submitted multiple sick-call requests to prison officials, advising them of his weight loss, fever with chills, shortness of breath, and painful areas on his fingers, arms, and toes. Other than ridiculing Gallicchio for being a "drug addict," the staff ignored his pleas for medical treatment. During this approximately two-month SHU confinement, Gallicchio lost a remarkable 50 pounds.

13.    At one point, Knibbs stopped by Gallicchio's SHU cell. When Gallicchio advised that he had lost a large amount of weight, had blood in his urine, was suffering from blurry vision and dizziness, and was in severe pain, Knibbs dismissed these alarming symptoms and simply said that "it's common to lose weight in the SHU."

14.    Shortly after the dismissal of his concerns by Knibbs, as Gallicchio was returning from a shower, he felt tremendously dizzy and weak. He passed out and, while unconscious, was taken to an outside hospital.

15.    The medical staff at the external hospital performed multiple diagnostic exams.

Testing established that a blood infection had eaten away the mitral valve in Gallicchio's heart, and that his slurred speech and other symptoms were signs of a stroke that had been mismanaged. On April 11, 2023, Gallicchio underwent open-chest surgery in which a cardiac surgeon performed a mitral valve replacement and bypass surgery.

16.    After the surgery, the cardiologist told Gallicchio that the prison waited too long to diagnose the infection and that, had they waited any longer, Gallicchio would have died.

17.    Gallicchio spent approximately two months in an outside hospital recuperating from the life-changing surgery.

18.    Upon his return from the months-long hospital stay, the prison warden, J.L. Jamison, callously made light of Gallicchio's near-death experience and blamed him for costing the prison $2 million.

19.    After his return, when Gallicchio saw Knibbs, Knibbs profusely apologized for his failure to properly diagnose the serious medical condition. Despite this episode, Knibbs was promoted by the BOP to a supervisory position.

IV.   ALLEGATIONS

20.    In addition to the reasonable duty owed by the BOP to Gallicchio pursuant to 18 U.S.C. § 4042(a), he has an established right to "medically necessary health care." See the Series 6000 BOP Program Statements. His documented conditions discussed herein consisted of "significant pain and discomfort which impairs the inmate's participation in activities of daily living," and thus have been determined by the BOP to be a serious "medically necessary" condition. See BOP P.S. 6031.04.

Claim No. 1 – Ordinary Negligence

21.   All preceding paragraphs are incorporated as if set forth fully herein.

22.   As a federal inmate, Gallicchio was completely dependent on the BOP's Health Services staff to provide for his medical needs and to ensure his well-being. Without responsible management of his health care, Gallicchio was left to wallow in his pain and suffering.

23.   Knibbs and VanderHey-Wright were directly responsible for Gallicchio's medical care. As employees of the United States, the medical staff were aware of Gallicchio's serious medical condition and his need for urgent diagnostic testing and medical treatment.

24.   Knibbs and VanderHey-Wright failed to adhere to the BOP's promulgated medical care protocols, failed to diagnose Gallicchio's symptoms, and failed to provide medically necessary care to him. Defendant's employees disregarded their duty to provide for Gallicchio's well-being and recklessly disregarded the substantial risk that his medical condition would be exacerbated by a delay in providing necessary care. Gallicchio displayed commonly known signs of a blood infection, stroke, and mitral valve dysfunction, yet despite being informed of his worsening condition, Defendant's employees refused to provide needed medical care.

25.   As a direct and proximate result of the delay in providing necessary medical treatment, Gallicchio has been harmed physically and mentally.

Claim No. 2 – Medical Malpractice / Professional Negligence

26.  All preceding paragraphs are incorporated as if set forth fully herein.

27.  Defendant's failure to immediately screen Gallicchio for his blood infection and stroke-like symptoms was a violation of BOP medical protocols and community standards of health care. These failures caused Gallicchio's injuries to worsen. As a result, he has been, and will continue to be, harmed physically and mentally.

Claim No. 3 – Intentional Infliction of Emotional Distress ("IIED")

28.  All preceding paragraphs are incorporated as if set forth fully herein.

29.  Defendant was aware of Gallicchio's worsening medical condition, which caused him a painful existence, and failed to alleviate any of his symptoms. Instead, Defendant's agents condemned Gallicchio to extra-punitive conditions of confinement that were so far outside the bounds of reasonableness and common-sense logic that the conduct was extreme and reckless.  As a result, Gallicchio has incurred extreme emotional distress.

V.   RELIEF REQUESTED

30.  Gallicchio requests an award of compensatory damages and any other relief available under law.

Dated: December 15, 2025
   New York, New York

Respectfully submitted,


LAW OFFICES OF FLORENCE D. ZABOKRITSKY



By: /s/ Florence D. Zabokritsky

FLORENCE D. ZABOKRITSKY

Law Offices of Florence D. Zabokritsky
102-02 Metropolitan Ave.

Forest Hills, NY 11375

Phone: (347) 480-8844

Email: FZ@FZLitigation.com


Attorney for Plaintiff

Vito Gallicchio